IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ALEXANDER MANUFACTURING, INC.                 CV. 06-735-PK
EMPLOYEE STOCK OWNERSHIP AND
TRUST

                                                                              OPINION AND
                          Plaintiff,                             ORDER

v.

ILLINOIS UNION INSURANCE CO.

                          Defendant.
_____

PAPAK, Magistrate Judge:

        Plaintiff Alexander Manufacturing Inc. Employee Stock Ownership Plan and Trust

(Trust) filed this suit against defendant Illinois Union Insurance Co. for breach of contract and

breach of good faith and fair dealing.  The Trust is the assignee of three former Alexander

Manufacturing directors, who were insured under a policy issued by Illinois Union.  Illinois

Union moved for summary judgment on four coverage issues, no loss, settlement without

consent, the fraudulent act exclusion and the common claim endorsement, and on the Trust's

breach of good faith claim.  The Trust filed a cross-motion for summary judgment on its breach

OPINION AND ORDER – PAGE 1

of good faith claim.  Although the parties do not characterize them as such, the motions on the

common claim endorsement and breach of good faith are actually partial motions for summary

judgment because they do not dispose of all the issues in the case.

The parties' motions for summary judgment are now before the court.  This court has

subject matter jurisdiction under 28 U.S.C. § 1332.  For the reasons set forth below, Illinois

Union's motions for summary judgment on the issue of no loss (#54), settlement without consent

(#57), the fraudulent act exclusion (#51), and bad faith (#48) are denied.  Illinois Union's motion

for summary judgment on the common claim endorsement (#60) is granted.  The Trust's cross

motion for summary judgment on the bad faith claim (#110) is denied.

## BACKGROUND

The Trust is a pension plan as defined by 29 U.S.C. § 1002(2)(A) of the Employee

Retirement Income Security Act of 1974.  The Trust is the sole shareholder of Alexander

Manufacturing, Inc, a manufacturer of custom cabinets.  (Maurer 2d Aff., #103, Ex. 1.)  Illinois

Union issued an insurance policy to Alexander Manufacturing for the policy period of January 1,

2003 to January 1, 2004.  (Philip Aff., #63, Ex.1; Maurer Aff., #72, Ex. 4.)  The current suit

arises out of that policy.

## I.    The Terms of the Insurance Policy

Alexander Manufacturing's insurance contract with Illinois Union includes directors and

officers liability coverage and fiduciary liability coverage, each with a limit of $1,000,000.

(Maurer Aff., Ex. 4, at 1.)

The directors and officers and company liability coverage includes the following

provisions:

OPINION AND ORDER – PAGE 2

1. Insurer shall pay on behalf of the Directors and Officers Loss resulting from any Claim first made against the Directors and Officers during the Policy Period for a Wrongful Act.

2. Insurer shall pay on behalf of the Company Loss which the Company is required or permitted to pay as indemnification to any of the Directors and Officers resulting from any Claim first made against the Directors and Officers during the Policy Period for a Wrongful Act.

3. Insurer shall pay on behalf of the Company Loss resulting from any Claim first made against the Company during the Policy Period for a Wrongful Act.

*Id.* at 6.

In addition, the section defines wrongful act as, "[A]ny actual or alleged error, omission, misleading statement, neglect, breach of duty or act by: a) any of the Directors or Officers, while acting in their capacity as: (i) a director, officer or employee of the Company. . . ." *Id.* at 7. The directors and officers provision exempts from coverage "any actual or alleged violation of the Employee Retirement Security Act of 1974, as amended, or any rules or regulations promulgated thereunder, or similar provisions of any federal, state or local statutory or common law." *Id.*

The fiduciary liability coverage provides, "Insurer shall pay on behalf of the Insureds Loss resulting from any Claim first made during the Policy Period for a Wrongful Act." *Id.* at 10. For the purposes of fiduciary coverage, wrongful act means:

a) with respect to a Sponsored Plan:

(i) any action or alleged breach of the responsibilities, obligations or duties imposed upon fiduciaries of the Sponsored Plan by the Employee Retirement Security Act of 1974, as amended, or by similar or common law,

(ii) any other matter claimed against the Sponsor Company or any of the Insured Persons solely because of the service of the Sponsor Company or any of the Insured Persons as a fiduciary of any Sponsored Plan, and

OPINION AND ORDER – PAGE 3

> (iii) any actual or alleged act, error or omission in the Administration of any
> Sponsored Plan, and
>
> b) with respect to an Insured Plan, any act, error or admission in the
> Administration of such Insured Plan.

*Id.* at 11.

The directors and officers coverage section and the fiduciary section define certain terms in the same way. Both have a definition of claim that includes, "[A]ny written or oral demand for damages or other relief against any of the Insureds, and . . . any judicial, administrative or arbitration proceeding initiated against any of the Insureds in which they might be subject to a binding adjudication of liability for damages or other relief." *Id.* at 6, 10. Both provide that "Loss means damages, settlements and Costs, Charges and Expenses incurred by" the insureds. *Id.* In addition, both the directors and officers coverage and the fiduciary coverage exclude claims brought about by "any dishonest, fraudulent or criminal act or omission" by any of the insureds, "as determined by a judgment or other final adjudication." *Id.* at 7, 11.

Both sections also separately provide that, "Interrelated Wrongful Acts means more than one Wrongful Act which have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions." *Id.* In addition, under the heading "Limit of Liability and Retention," both sections separately provide, "More than one Claim involving the same Wrongful Act or Interrelated Wrongful Acts shall be deemed to constitute a single Claim . . ." *Id.* at 8, 12.

Apart from the definitions provided in the directors and officers and fiduciary coverage sections, the policy also addresses interrelated wrongful acts generally. In the "General Terms and Conditions" section, under the heading "Limits of Liability and Retentions," the policy states:

OPINION AND ORDER – PAGE 4

In the event that any Claim or more than one Claim arising from Interrelated Wrongful Acts shall be covered, in whole or in part, under two or more Insuring Clauses or more than one Coverage Section, the total applicable Retention shall not exceed the single largest applicable Retention. Such largest applicable Retention shall apply only once to such Claim.

*Id.* at 3. The policy also includes a common claim endorsement, which provides:

IN CONSIDERATION of the premium charged for this Certificate, it is hereby understood and agreed that notwithstanding the provisions of this Certificate in respect of any Claim or more than one Claim which arises out of any Interrelated Wrongful Acts, which would, in whole or in part, be covered under the Directors and Officers Coverage Section and the Fiduciary Coverage Section, the Limit of Liability of Underwriters for all Loss incurred from all such Claims shall not exceed the sum of $1 million.

It is further agreed that the allocation of covered Loss between these Coverage Sections with respect to such Claim or Claims shall be made at the discretion of the Underwriters.

*Id.* at 21.

Finally, the policy includes a settlement and defense clause, which provides:

1.  No settlement shall be made or negotiated and no Costs, Charges and Expenses shall be incurred without Insurer's consent, such consent not to be unreasonably withheld. Insurer shall have the right to investigate and settle any Claim; provided, however, no settlement shall be made without consent of the Parent Company, such consent not to be unreasonably withheld.

2.  Insurer shall have the right and duty to defend any Claim and such right and duty shall exist even if any of the allegations are groundless, false or fraudulent. The Parent Company shall have the right to assume the duty to defend any Claim provided Insurers consent in writing to such assumption. Costs, Charges and Expenses incurred by Insurer, or by the Insureds when defending or investigating with the written consent of Insurer, shall be paid by Insurer as a part of, and not in addition to, Insurer's Limit of Liability set forth in Item C of the Declarations for applicable Coverage Section.

*Id.* at 5. Item C indicates a $1 million limit of liability for directors and officers coverage and a

$1 million limit of liability for fiduciary coverage. *Id.* at 1.

OPINION AND ORDER – PAGE 5

II.    **The Underlying Dispute**

Although Alexander Manufacturing posted profits in excess of $1 million in 2001, in 2002 it received less revenue than it expected.  (Maurer 2d Aff., Ex. 2, at 3-4.)  By mid-2002, Alexander Manufacturing's chief executive officer, William Klutho, and two other Alexander Manufacturing officers, Donald Thoreson and Daniel Spofford, knew the company risked significant losses but withheld the company's financial condition from the board of directors and trustees.  (Maurer Aff., Ex. 12, at 10, 12; Maurer 2d Aff., Ex. 1, at 3.)  At the same time, Alexander Manufacturing incurred substantial costs and increased expenses for expected new work.  (Maurer Aff., Ex. 12, at 6-7, 11; Maurer 2d Aff., Ex. 1, at 3.)  Plaintiff's expert indicates that had Alexander Manufacturing known of the financial losses, it could have avoided further losses by implementing proper cost-cutting measures.  (Maurer Aff., Ex. 2, at 8-10.)

In early 2003, Klutho provided false financial information to the company's accountants. Klutho shifted the costs of one job to another job to make Alexander Manufacturing appear to be in a better financial condition than it actually was.  (Philip Aff., Ex. 12, at 1-2, Ex. 26, at 14, Ex. 28, at 6; Maurer 2d Aff., Ex. 7, at 109.)  Thoreson and Spofford knew that Klutho had shifted costs.  (Philip Aff., Ex. 26, at 14.)  Based on the false information, Alexander Manufacturing's accountants prepared a 2002 financial statement indicating that the company made a $12,000 profit in 2002.  (Philip Aff., Ex. 2, at 5.)  In addition, a yearly valuation of Alexander Manufacturing's shares based on the false financial statement concluded that the shares were worth $0.56 per share.  (Philip Aff., Ex. 3, at 3.)

In August 2003, after they acquired the correct financial information, Alexander Manufacturing's accountants determined that the company had actually suffered a $1.7 million

OPINION AND ORDER – PAGE 6

loss in 2002.  (Philip Aff., Ex. 4, at 5; Maurer 2d Aff., Ex. 1, at 4.)  The Trust and board of directors did not know that the financial information was inaccurate until Klutho informed them at that time.  (Philip Aff., Ex. 26, at 23; Maurer 2d Aff., Ex. 1, at 4.)  Moreover, in late 2003, a valuation of Alexander Manufacturing shares based on the restated financial statement concluded that the shares were worthless.  (Philip Aff., Ex. 5, at 3.)

The parties dispute whether the false financial statements caused the company any harm. The Trust's expert opines that the officers' actions caused a $3 million loss in share value. (Maurer. Aff., Ex. 2, at 11.)  The Trust's expert further states that, had Alexander Manufacturing known of the losses, it could have avoided further losses and would still be a going concern.  *Id.* at 10.  A trustee also indicated that the Trust would have undertaken efforts to obtain new capital. (Maurer 2d Aff., Ex. 1, at 5.)  Illinois Union's expert, on the other hand, opines that the value of the stock at the end of 2002 was the same as the value of the stock at the corrected valuation in late 2003 and that it would be speculative to conclude that Alexander Manufacturing could have remained a going concern had it issued a correct financial statement for 2002.  (Philip Aff., Ex. 19, at 21.)  Thus, the defense expert testified that the misleading financial statements did not cause the company any harm.  (Philip Aff., Ex. 28, at 26, 31.)  Illinois Union, however, prepared an internal report that indicated the "Insured's potential exposure ranges from $2,750,000 to $5,750,000 depending on the valuation of the Alexander Manufacturing stock."  (Maurer Aff., Ex. 5, at 11.)

A.      **The Emerson Hardwood Company Suit**

In 2004, Emerson Hardwood Company, one of Alexander Manufacturing's vendors, filed a claim against Alexander Manufacturing, Klutho, Thoreson and Spofford, alleging that, between

June 2003 and January 2004, it extended credit to Alexander Manufacturing based on the false financial statement. (Philip Aff., Ex. 13.) The complaint further alleged that Klutho failed to provide the corrected financial statements to Emerson after the statements became available in August 2003. *Id.*

At their request, Illinois Union defended Alexander Manufacturing, Klutho, Thoreson and Spofford and settled the matter. (Philip Aff., Ex. 9, Ex. 18.) Illinois Union applied a $5,000 retention and allocated the cost of the defense and settlement to the directors and officers coverage available under the policy. (Maurer 2d Aff. Ex. 11, Ex. 12, at 157.) The settlement occurred two weeks before the mediation of the Trust's suit, described below. (Maurer 2d Aff., Ex. 12, at 153.) Illinois Union paid $40,000 to settle the case plus defense costs for a total cost of $170,000 to $185,000. (Maurer 2d Aff., Ex. 12, at 153; Maurer 3d Aff., #119, Ex. 4.)

**B.      The Trust's Suit**

In addition to the Emerson Hardwood suit, the Trust filed an action against Klutho, Spofford, Thoreson and Alexander Manufacturing in late 2004, alleging breach of fiduciary duty under the Employee Retirement Income Security Act. (Maurer Aff., Ex. 1.) The Trust also brought a derivative action, alleging that Klutho, Spofford and Thoreson had breached certain duties owed as directors and officers of Alexander Manufacturing. *Id.* Specifically, the complaint alleged that 1) Klutho made numerous "wrongful" job cost adjustment entries resulting in materially deceptive financial reports; 2) Spofford and Thoreson knew of the Klutho's actions; 3) Klutho, Spofford and Thoreson did not disclose Klutho's actions to the board or the Trust; and 4) Klutho, Spofford and Thoreson's actions "caused great financial harm" to Alexander Manufacturing. *Id.* at 3-4.

Illinois Union retained counsel for the officers and Alexander Manufacturing.  (Maurer Aff., Ex. 5, at 11; Maurer 2d. Aff. Ex. 12 at 135.)  The defendants moved for summary judgment, arguing in part that the directors' acts did not cause any harm to the Trust or to Alexander Manufacturing.  (Maurer 2d. Aff., Ex. 6, at 4.)  Plaintiffs responded to the motion by asserting that the directors harmed the company by increasing expenditures in 2002 while hiding losses from the board of directors.  *Id.* at 7.

Illinois Union initially determined that the Trust's cause of action against Klutho, Spofford and Thoreson fell under the fiduciary coverage and stated as much in a letter to Klutho on June 14, 2005.  (Maurer Aff. Ex. 5, at 4; Maurer 2d. Aff. Ex. 12 at 74-75, 80, 82-83, Ex. 19.)  The letter, however, reserved Illinois Union's right to make a different determination under the terms of the policy and explicitly stated that Illinois Union did not waive any of its rights.  (Maurer 2d Aff., Ex. 19, at 4.)  In an email to insurance defense counsel, Illinois Union indicated that the claim "would be denied" under the directors and officers coverage section.  (Maurer 2d Aff. Ex. 18.)  The claims adjuster prepared an internal report, which indicated that the matter fell under the fiduciary coverage section and had a $5,000 retention.  (Maurer 2d. Aff. Ex. 12, at 154.)  If the claims adjuster had determined that the claim involved an interrelated wrongful act with the Emerson claim, then it would not have applied an additional retention.  (Maurer 2d. Aff. Ex. 12, at 155-160; Maurer 3d Aff. Ex. 1, at 27.)

On August 8, 2005, the Trust offered to settle for what it asserted as the applicable policy limit:  $1 million under the fiduciary coverage and $1 million under the directors and officers coverage.  (Maurer 2d Aff. Ex.  22, at 7.)  Illinois Union's counsel informed counsel for Klutho, of the offer and and suggested he confer with Klutho, Thoreson and Spofford regarding the offer.

(Bernstein 2d Decl., #116, Ex. A., at 7.)  In addition, Illinois Union's counsel informed Klutho's counsel that it estimated the low end of damages at $2.7 million and that the amount available for indemnity was decreased by defense costs.  *Id.* at 8-9.

      **C.    Mediation and Settlement of the Trust's Suit**

During mediation of the Trust's suit in early October 2005, Illinois Union's coverage counsel indicated that $300,000 was available under the directors and officers coverage section. (Bernstein 2d Decl., Ex. B, at 16.)  He offered to "use his resources" to settle the claim for approximately $300,000, the limit remaining under the directors and officers coverage after subtracting the defense and settlement of the Emerson Hardwood claim and the defense of the Trust's claim.  (Maurer Aff., Ex. 11, at 1-2; Bernstein Decl., #108, Ex. A, at 2-4.)  The Trust's counsel said his clients would not accept an offer to settle for that amount. (Bernstein Decl., Ex. A, at 4-5; Bernstein 2d Decl., Ex. A, at 20.)

The $300,000 figure quoted by Illinois Union as the approximate policy limit was in error.  As noted, resolution of the Emerson claim involved $170,000 to $185,00 in costs. According to an internal memo prepared on the eve of mediation, Illinois Union estimated the defense costs in the Trust claim to total $388,000 at that time, with an additional $50,000 in expert fees, for an approximate total of $438,000 in costs.  (Maurer 2d. Aff., Ex. 24.)  An internal memorandum prepared in January 2006, however, indicated defense costs to that date were $371,097.59, but did not separately list expert fees.  (Maurer 3d Aff., Ex. 3.)  Thus, Illinois Union overestimated defense costs on the eve of mediation and actually had approximately $377,000 to $458,900 available to settle the claim.

Illinois Union took the position that both the fiduciary coverage and the directors and

OPINION AND ORDER – PAGE 10

officers coverage applied but the common claim endorsement limited coverage to the $1 million

limit, minus the costs already disbursed for the Emerson suit.  (Maurer Aff., Ex. 6, at 2-3; Philip

Aff., Ex. 20, at 2-3.)  Klutho testified that he first learned of Illinois Union's decision to allocate

the Trust's claim to the directors and officers coverage at the mediation or shortly thereafter.

(Maurer 2d Aff., Ex. 7, at 13-15.)  Illinois Union, however, normally notifies insureds when it

changes its position on coverage.  (Maurer 2d Aff. Ex. 12, at 9; Maurer 3d Aff., Ex. 1, at 13-14.)

In addition, an Illinois Union representative testified that, although he could not personally

remember the reasons for shifting the claim to directors and officers coverage, Illinois Union

made the shift because it determined that the Trust claim and the Emerson claim were

interrelated wrongful acts.  (Maurer 2d Aff.. Ex. 30, at 99; Maurer 3d Aff., #119, Ex. 1, at 11-13.)

     Illinois Union also asserted during the mediation that it had a basis to rescind the

insurance contract on the ground that it had relied on the false financial reports when it decided

to underwrite the 2003-2004 policy.  (Philip Aff., Ex. 20, at 11; Maurer Aff., Ex. 6, at 4.)

Klutho, however, signed the renewal application in December 2002 and, at that time, only the

2001 financial statement was available.  (Maurer 2d Aff., Ex. 7, at 11.)  The misleading 2002

financial statement was not completed until February 2003 and thus was not part of the renewal

application.  *Id.*  In addition, Illinois Union did not advise the directors of the possibility of

rescission before it took that position during mediation  (Maurer 2d Aff., Ex. 12, at 27.)

     The Trust offered to settle with Klutho, Thoreson and Spofford "for payment of the

fiduciary policy limits minus defense costs," an amount the Trust estimated at $620,000.

(Maurer Aff., Ex. 10, at 3.)  Illinois Union told counsel for the Trust that it would not accept that

offer.  (Bernstein 2d Decl., Ex. B, at 11-12.)  Later the same day, Illinois made a written offer to

OPINION AND ORDER – PAGE 11

settle for the amount remaining under the directors and officers coverage.  *Id.* at 12-13.  Before

the Trust received Illinois Union's written offer to settle, it entered into an agreement with the

directors.  (Bernstein 2d Decl., Ex. B, at 13.)

>    **D.    The Settlement Agreement**

The parties to the Trust's suit settled their claims without Illinois Union's consent.  (Philip

Aff., Ex. 25, at 6; Maurer Aff., Ex. 8, at 7.)  Klutho's counsel indicated that the directors were

mainly concerned with "making a quick exit" and that his primary concern was to "get them out

of the litigation."  (Bernstein 2d Decl., Ex. A, at 14-16, 21.)  Moreover, the directors agreed to

contribute $30,000 toward the settlement, regardless of how much Illinois Union would provide

as indemnity.  *Id.* at 17.  The directors also forfeited their accounts in the Alexander

Manufacturing employee stock ownership plan and agreed to forgo collection of money due from

the plan.  (Maurer Aff., Ex. 27.)

Under the terms of the settlement agreement, the Trust agreed to dismiss, with prejudice,

all causes of action it alleged against Alexander Manufacturing and its officers and directors.  *Id.*

Klutho, Thoreson and Spofford each agreed to pay $10,000 and jointly and severally agreed to

pay $1.3 million.  *Id.*  Thoreson agreed to a judgment against him for the $1.3 million.  *Id.*  The

Trust, however, agreed to not file the stipulated judgment and to not proceed against the officers'

individual assets other than their claims or causes of action against Illinois Union.  *Id.*  Thus,

Klutho, Spofford and Thoreson assigned their rights under the Illinois Union policy to the Trust

and the Trust agreed to seek satisfaction of the judgment solely from that asset.  *Id.*

The settlement agreement further provided that the assignment of rights under the

insurance policy did not "release Klutho, Spofford and Thoreson from the liability, nor should it

OPINION AND ORDER – PAGE 12

be construed to in any way affect any obligation of indemnity on the part of the insurance company." *Id.* Moreover, Klutho, Spofford and Thoreson agreed to cooperate with the Trust in any litigation against Illinois Union. *Id.* The agreement also stated that Illinois Union's threat to rescind the policy and its position that only directors and officers coverage was available precipitated the settlement. *Id.* Counsel for Klutho, however, indicated that the directors did not believe a verdict would have been entered against them, but wanted to avoid that possibility. (Bernstein Decl., Ex. A, at 23.)

The Trust then filed the present suit against Illinois Union. The parties filed cross-motions for summary judgment on the issue of the assignability of claims. This court granted defendant's motion, denied plaintiff's motion and dismissed the case. The Ninth Circuit reversed that decision on appeal. The case is now before the court on defendant's motion for summary judgment on several coverage issues and the parties' cross motions for summary judgment on the breach of good faith claim.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court cannot weigh the evidence or determine the truth and must construe the evidence in the light most favorable to the nonmoving party. *Playboy Enters., Inc. v. Welles,* 279 F.3d 796, 800 (9th Cir. 2002). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island*

*Air. Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (citation omitted).

On cross-motions for summary judgment, the court must consider each motion separately to determine whether either party has met its burden with the facts construed in the light most favorable to the nonmoving party. Fed. R. Civ. P. 56; *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). Summary judgment, of course, may not be granted where the court finds unresolved issues of material fact, even in situations where the cross motions allege that no disputed facts exist. *Id.*

## DISCUSSION

Oregon law applies to the contract at issue in this case. *Alexander Mfg. v. Illinois Union Ins. Co.*, 560 F.3d 984, 986 (9th Cir. 2009). In Oregon, the interpretation of an insurance contract is a question of law. *Hoffman Constr. Co. v. Fred S. James & Co.*, 313 Or. 464, 469-471, 836 P.2d 703 (1992). Moreover, "[d]espite ordinary rules of contract interpretation, extrinsic evidence of the parties' intent is not part of the interpretation of an insurance policy." *Employers Ins. of Wausau v. Tektronix, Inc.*, 211 Or. App. 485, 504, 156 P.3d 105 (2007) (citations omitted).

The first rule of contract construction is to "ascertain the intention of the parties" through analysis of the terms, conditions, and definitions in the contract. *Hoffman Constr. Co.*, 313 Or. at 469 (quotation omitted); *see also* Or. Rev. Stat. § 742.016. When parties assert competing plausible interpretations of a term in an insurance policy, the court must engage in a series of analytical steps. *Id.* at 470. If the policy does not define the phrase in question, the court must consider whether the phrase has a plain meaning. *Holloway v. Republic Indem. Co. of Am.*, 341 Or. 642, 649, 147 P.3d 329 (2006). If, however, the phrase in question has more than one

OPINION AND ORDER – PAGE 14

plausible interpretation, the court must then determine whether both interpretations remain reasonable in light of the phrase's particular context and the broader context of the policy as a whole. *Id.* at 650. If that contextual analysis yields two or more reasonable interpretations, then the court should construe the remaining ambiguity against the drafter. *Id.*

Here, Klutho, Thoreson and Spofford assigned their rights under their policy with Illinois Union to the Trust and the Trust therefore stands in their shoes. *See Commonwealth Electric Co. v. Fireman's Fund Ins. Co.*, 93 Or. App. 435, 438, 762 P.2d 1041 (1988) ("An assignee stands in the shoes of the assignor and acquires no greater interest than the assignor possessed."). I therefore interpret the insurance contract as it applies to coverage of Klutho, Thoreson and Spofford for their acts as directors and officers of Alexander Manufacturing.

## I.      Defendant's Motion for Summary Judgment Regarding Whether the Insureds Incurred a Loss

Illinois Union seeks summary judgment on the ground that the Trust cannot recover because Klutho, Thoreson and Spofford did not suffer a loss as that term is defined in the policy. Specifically, Illinois Union contends that, with the exception of the $30,000 they tendered at the time they settled, Klutho, Thoreson and Spofford did not incur a loss because the Trust agreed not to enter a judgment against them.

Illinois Union's argument is unpersuasive. The policy defines "loss" as "damages, settlements and Costs, Charges and Expenses incurred" by the insureds. While the policy does not define "incur," its plain meaning is "to become liable or subject to," Merriam-Webster Online Dictionary, *at* http://www.merriam-webster.com/dictionary/incur (Aug. 18, 2009), or "to suffer or bring on oneself," Black's Law Dictionary 341 (2d Pocket Ed. 2001). Here, Klutho, Thoreson and Spofford are subject to their settlement agreement with the Trust, brought that settlement on

OPINION AND ORDER – PAGE 15

themselves, and are liable under that settlement to assign their rights under the policy and to

perform other obligations, such as testify in the present action.  Thus, the three directors incurred

a settlement and, because the policy includes settlements in its definition of loss, the directors

incurred a loss under the terms of the policy.

The policy's definition of loss places it outside the rule that an injured party's promise not

to execute a judgment against the insured may, in certain circumstances, eliminate the insurer's

obligation to indemnify the insured.  *See Stubblefield v. St. Paul Fire & Marine Ins. Co.*, 267 Or.

397, 401, 517 P.2d 262 (1973).  In *Stubblefield*, the injured party acquired no enforceable rights

from the insured's assignment of his policy because the injured party, before entry of judgment,

unconditionally agreed not to execute the judgment against the insured and the policy

indemnified the insured only for sums he was "legally obligated to pay."  *Id.* at 400.  Later cases

have held that *Stubblefield* turned on the fact that the indemnity clause covered only sums that

the insured was legally obligated to pay.  *Terrain Tamers Chip Hauling, Inc. v. Ins. Mktg. Corp.

of Oregon*, 210 Or. App. 534, 539-540, 152 P.3d 915 (2007) (citing cases).  Thus, *Stubblefield*

does not control here, where the policy includes settlement within the definition of loss, without

any caveat that the insured must be legally obligated to pay.  *See id.*

Moreover, "for the rule of *Stubblefield* to apply, the settlement agreement must

'unambiguously' and 'unconditionally' eliminate any liability" that would trigger the insurer's

obligation to indemnify.  *Id.* at 540 (holding that settlement agreement did not eliminate the

insurer's obligation because the covenant not to execute was "arguably conditional" on the

insured's prosecution of an action against the insurance agent and payment of any proceeds from

that action); *Oregon Mutual Ins. Co. v. Gibson*, 88 Or. App. 574, 578, 746 P.2d 245 (1987)

OPINION AND ORDER – PAGE 16

(settlement agreement defeated injured party's claim for failure to procure adequate insurance because it unambiguously and unconditionally stated that the insured was not obligated to pay more than the $1 million available under existing coverage)[1]; *see also Lancaster v. Royal Ins. Co. of Amer.*, 302 Or. 62, 69, 726 P.2d 371 (1986) (reversing grant of summary judgment in favor of the insurer because a question of fact remained regarding whether the injured party agreed not to execute the judgment against the insured's assets).

Here, the settlement agreement did not unambiguously or unconditionally eliminate the directors' liability. Although the Trust agreed to seek satisfaction of the judgment solely from Illinois Union, the settlement agreement provided that the assignment of rights under the insurance policy did not "release Klutho, Spofford and Thoreson from the liability, nor should it be construed to in any way affect any obligation of indemnity on the part of the insurance company." Moreover, the agreement required that Klutho, Spofford and Thoreson cooperate with the Trust in any litigation against Illinois Union. Thus, because the settlement did not unconditionally eliminate the director's liability, it did not defeat Illinois Union's obligation to indemnify. Accordingly, I deny Illinois Union's motion for summary judgment on the issue of no loss.[2]

---

1  In *Terrain Tamers*, the court questioned whether its decision in *Oregon Mutual* remained good law in light of its later decisions that stated *Stubblefield* turned on the indemnity clause that covered only sums the insured was legally obligated to pay. 210 Or. App. at 539-540.

2  The parties also dispute whether Oregon Revised Statute section 31.825 applies to the settlement agreement. That statute provides:

> A defendant in a tort action against whom a judgment has been rendered may assign any cause of action that defendant has against the defendant's insurer as a result of the judgment to the plaintiff in whose favor the judgment has been entered. That assignment and any release or covenant given for the assignment shall not extinguish the cause of action against the insurer unless the assignment specifically so provides.

OPINION AND ORDER – PAGE 17

II.     **Defendant's Motion for Summary Judgment Regarding the Dishonest or Fraudulent Acts Exclusion**

The insurance contract between Alexander Manufacturing and Illinois Union excludes coverage for claims "brought about or contributed to by . . . any dishonest, fraudulent or criminal act or omission" by any of the insureds, "as determined by a judgment or other final adjudication." Illinois Union argues that the Trust's claims fall under the dishonest or fraudulent act exclusion.

The Trust argues that Klutho's act of shifting job costs to hide losses did not form the basis for its claims because those claims focused in part on the directors' decision to "ramp up" the company when it was suffering financial losses. The Trust's lawsuit against the directors alleged both that Klutho had wrongfully shifted job costs and that Klutho, Spofford and Thoreson incurred significant costs while the company was losing money and failed to disclose the situation to the board. Thus, Klutho's act of shifting job costs was part of the suit and therefore "contributed to" the Trust's claim. I must therefore determine whether the dishonest or fraudulent exclusion applies.

The Trust argues that the exclusion does not apply, because no court has entered a judgment or final adjudication that Klutho's acts were fraudulent or dishonest. Illinois Union argues that the court hearing the insurance coverage dispute may issue a "judgment or other final adjudication" that the insured's acts were fraudulent or dishonest. Because the policy does not

---

Or. Rev. Stat. § 31.825. The law, initially codified at section 17.100, was introduced in 1989, at the request of the Oregon Trial Lawyers Association. S.B. 519, 65th Oregon Leg. Assem., Reg. Sess. (1989), 1989 Or. Laws 465. The Oregon courts, however, have not addressed whether section 31.825 overrules *Stubblefield* and *Oregon Mutual. See Terrain Tamers*, 210 Or. App. at 537. This court need not reach the issue however, because, even without the protection of section 31.825, *Stubblefield* does not defeat the Trust's claims.

OPINION AND ORDER – PAGE 18

define "judgment" or "final adjudication," I must look to the plain meaning of those terms.

The plain meanings of judgment and adjudication encompass both a decision that a judge renders in the course of a case as well as the final outcome in a case.  The most relevant dictionary entries for judgment are: "a formal utterance of an authoritative opinion," "a formal decision given by a court to become liable or subject to," Merriam-Webster Online Dictionary, *at* http://www.merriam-webster.com/dictionary/judgment (Aug. 21, 2009) and "a court's final determination of the rights and obligations of the parties in a case," Black's Law Dictionary 377 (2d Pocket Ed. 2001).  Similarly, adjudication means, "a judicial decision or sentence," Merriam-Webster Online Dictionary, *at* http://www.merriam-webster.com/dictionary/adjudication (Aug. 21, 2009) and "[t]he legal process of resolving a dispute; the process of judicially deciding a case," Black's Law Dictionary 16 (2d Pocket Ed. 2001).

The surrounding language in the insurance policy favors the Trust's interpretation that "judgment" or "final adjudication" means a final judicial decision.  The provision refers to a "judgment or *other* final adjudication," which suggests that judgment refers to the final outcome of a case.  *See Nat'l Union Fire Ins. Co. v. Continental Illinois Corp.*, 666 F. Supp. 1180, 1197 (N.D. Ill. 1987) (construing "a judgment or other final adjudication" to mean a final judicial decision and holding that, once the underlying claims settled, the insurer could not later litigate the question of dishonesty); *Pepsico, Inc. v. Continental Casualty Co.*, 640 F. Supp. 656, 660 (S.D.N.Y. 1986) (same).  None of the other policy provisions lend support to any other conclusion.

Even if Illinois Union's interpretation is also reasonable, that merely means that the term "judgment or other final adjudication" is ambiguous.  *See Holloway*, 341 Or. at 649.  Under

OPINION AND ORDER – PAGE 19

Oregon law, I construe any remaining ambiguity against the drafter, *id.*, and thus conclude that "judgment or other final adjudication" refers to a final outcome of a case, not a decision during the course of a case.  Therefore, Illinois Union's motion for summary judgment on the fraudulent or dishonest act exclusion is denied.

**III.    Defendant's Motion for Summary Judgment Regarding Settlement Without Consent**

To prevail on a defense of an insured's noncompliance with a consent-to-settle provision, an insurer must prove that: 1) the insured failed to comply with the provision and 2) the claimant's conduct prejudiced the insurer.  *Federated Serv. Ins. Co. v. Granados*, 133 Or. App. 5, 9-10, 889 P.2d 1312 (1995) (reversing trial court's grant of summary judgment to the insurer where a genuine issue of fact remained regarding whether the plaintiff's breach of the consent-to-settle provision prejudiced the insurer).  Moreover, "even if the insurer proves both of those elements, the insured may nevertheless prevail if he or she acted reasonably in breaching the consent-to-settle provision."  *Workman v. Valley Ins. Co.*, 147 Or. App. 667, 672-673, 938 P.2d 219 (1997) (citation omitted).

Here, Illinois Union seeks summary judgment on the ground that Klutho, Thoreson and Spofford breached the insurance contract when they settled without Illinois Union's consent and that, as a result, the Trust is not entitled to recover.  Neither party disputes that Klutho, Thoreson and Spofford settled without Illinois Union's consent.  I must therefore examine whether the settlement prejudiced Illinois Union and whether the directors' decision to settle was reasonable.

**A.    Whether Settlement Prejudiced Illinois Union**

Illinois Union also argues that the $1.3 million settlement caused prejudice because it was over the coverage amount and lacked factual support.  The parties, however, offer competing

OPINION AND ORDER – PAGE 20

facts on this issue.  The Trust offers expert testimony that, had Alexander Manufacturing known

of the losses, it could have cut back on expenditures, avoided further losses and remained in

business.  The expert further concluded that the officers' actions caused a $3 million loss in share

value.  Illinois Union's expert, on the other hand, indicated that Alexander Manufacturing's stock

value when Klutho shifted costs at the end of 2002 was the same as the corrected value in late

2003 and that it is speculative to conclude that Alexander Manufacturing could have remained in

business had Klutho provided the correct financial information.  In addition, Spofford testified

that the misleading financial statements did not cause the company any harm.  Thus, I conclude

that an issue of fact remains regarding whether the $1.3 million settlement prejudiced Illinois

Union.

### B.        Reasonableness of the Directors' Decision to Settle

"[A]n insured may act reasonably in breaching a consent-to-settle provision if the insurer

unreasonably either withholds consent or denies the insured's claim." *Federated Serv. Ins. Co.*,

133 Or. App. at 9 n.4 (citation omitted).  In addition, although the standard to measure the

reasonableness of the settlement has not been definitively settled in Oregon, this court,

interpreting Oregon law, concluded that a settlement that is the process of good-faith, arms-

length negotiations creates a rebuttable presumption of reasonableness. *Fireman's Fund Ins. Co.*

*v. Security Nat'l Ins. Co.*, No. 99-6274, 2003 U.S. Dist. LEXIS 27840, at *15-16 (D. Or. Mar. 21,

2003).

Here, Illinois Union's conduct does not justify the directors' decision to settle without its

consent.  The facts show that Illinois Union did not deny coverage, as it paid to defend the

directors in the underlying cause of action.  It also asserted rescission as a defense to indemnity

OPINION AND ORDER – PAGE 21

in that action, but did not threaten to discontinue payment for the directors' defense or withhold

consent to settle on that basis.  Moreover, although Illinois Union rejected the Trust's offer to

settle for the amount remaining under the fiduciary coverage section, it also indicated its

willingness settle for the amount it estimated to be remaining under the directors and officers

coverage section.

Reading the facts in the light most favorable to the non-moving party, however, the

settlement appears to be the product of an arms-length negotiation conducted in good faith.  A

private mediator conducted the settlement negotiations.  The parties knew limited funds were

available for indemnity and that defense costs decreased those funds.  Counsel for the insured

indicated that, although they believed they could prevail, they wished to avoid the possibility of a

verdict against them.  Thus, I presume that the settlement was reasonable.  Illinois Union has not

presented evidence to rebut that presumption.  Accordingly,  Illinois Union's motion for summary

judgment on settlement without consent is denied.

IV.    **Defendant's Motion for Summary Judgment Regarding the Common Claim Endorsement**

As noted above, Illinois Union's insurance contract with Alexander Manufacturing

includes a common claim endorsement, which provides:

> [I]n respect of any Claim or more than one Claim which arises out of any
> Interrelated Wrongful Acts, which would, in whole or in part, be covered under
> the Directors and Officers Coverage Section and the Fiduciary Coverage Section,
> the Limit of Liability of Underwriters for all Loss incurred from all such Claims
> shall not exceed the sum of $1 million.
>
> It is further agreed that the allocation of covered Loss between these Coverage
> Sections with respect to such Claim or Claims shall be made at the discretion of
> the Underwriters.

Both the directors and officers and the fiduciary sections also provide that, "Interrelated

OPINION AND ORDER – PAGE 22

Wrongful Acts means more than one Wrongful Act which have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions."  In addition,  under the heading "Limit of Liability and Retention," both sections separately provide, "More than one Claim involving the same Wrongful Act or Interrelated Wrongful Acts shall be deemed to constitute a single Claim."

### A.    Whether the Duty to Indemnify Involves a Factual Inquiry

As an initial matter, the court must decide whether it may look beyond the allegations in the complaints in the underlying suits to determine whether they involved interrelated wrongful acts.  The parties do not address the issue.  Illinois Union focuses on the allegations in the Trust's complaint against the directors and Alexander Manufacturing.  The Trust, however, focuses on the summary judgment briefing in the Trust's suit, where the Trust asserted that the directors harmed the company by increasing expenditures in 2002 while hiding losses from the board of directors.

"The duty to indemnify is independent of the duty to defend."  *W. Equities, Inc. v. St. Paul Fire & Marine Ins. Co.*, 184 Or. App. 368, 374, 56 P.3d 431 (2002).  In Oregon, while courts look to the complaint to determine whether an insurer has a duty to defend, courts determine a duty to indemnify by examining proof of actual facts demonstrating a right to coverage.  *Ledford v. Gutoski*, 319 Or. 397, 399, 403, 877 P.2d 80 (1994) ("[T]he facts proved at trial on which liability is established may give rise to a duty to indemnify if the insured's conduct is covered.")  I therefore look beyond the complaints in the Emerson and Trust suits to the facts underlying those actions to determine whether they involve interrelated wrongful acts.

OPINION AND ORDER – PAGE 23

**B.    Whether the Emerson Claim and the Trust Claim Involve Interrelated Wrongful Acts**

The parties do not dispute that Emerson made its claim first and that the suit involved only the directors and officers coverage.  Rather, the parties dispute whether the Emerson Hardwood claim and the Trust's claim involve interrelated wrongful acts that would trigger the common claim endorsement.  Illinois Union argues that the Emerson claim and the Trust's subsequent claim arose out of the same wrongful act, Klutho's falsification of records, and thus constitute a single claim.  The Trust asserts that the Emerson claim and the Trust claim do not involve interrelated wrongful acts or, at the least, a question of fact exists regarding that issue.

Here, the policy provides a specific definition for interrelated wrongful acts as acts "which have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions."  Several courts have construed similar definitions.  In the simplest of these cases, the claims involved the same acts and the courts thus readily concluded that the claims were interrelated.  *See Highwoods Props. v. Exec. Risk Indem., Inc.,* 407 F.3d 917, 924-925 (8th Cir. 2005) ( although lawsuits alleged different legal theories, they were related because they both alleged that the insured provided misleading information to shareholders to obtain favorable votes for a merger); *WFS Financial, Inc. v. Progressive Cas. Ins. Co.*, No. 04-976, 2005 U.S. Dist. LEXIS 46751, at *14 (C.D. Cal. Mar. 31, 2005) *aff'd* 2007 U.S. App. LEXIS 8973, at *3-4 (9th Cir. Apr. 16, 2007) (two class action suits alleging different legal theories nevertheless involved interrelated acts because they both alleged that auto dealers' practice of marking up interest rates based on subjective criteria was discriminatory to minority applicants); *Tri Core Inc. v. Northland Ins. Co.*, No. 01-1431, 2002 U.S. Dist. LEXIS 21899, at *13 (N.D. Tex. Nov. 12, 2002) (the factual allegations and legal theories were "substantially the

OPINION AND ORDER – PAGE 24

same").

Here, the Emerson action and the Trust's action involve overlapping, but not identical, acts. The Emerson action involved Klutho's improper job cost entries in early 2003, resulting in misleading 2002 financial statements that Emerson relied on when it extended credit to Alexander Manufacturing in 2003 and early 2004. While the Trust's action also alleged that Klutho shifted job cost entries resulting in materially deceptive financial reports, the Trust further asserted that the directors harmed the company by increasing expenditures in 2002 while hiding losses from the board of directors.

Some courts faced with claims that involve overlapping, but not identical acts focus on the acts alleged rather than a broader course of conduct to decide whether the acts involve a "common nexus" or "related" facts, circumstances, situations, events, or transactions. *See KB Home v. St. Paul Mercury Ins. Co.*, 621 F. Supp. 2d 1271, 1277-78 (S.D. Fla. 2008) (employment discrimination claim that arose in part out of managers' behavior during a company function was not related to employment discrimination claim regarding conduct that took place after other claimant left the company); *Axis Surplus Ins. Co. v. Johnson*, No. 06-500, 2008 U.S. Dist. LEXIS 77614, at *23 (N.D. Okla. Oct. 3, 2008) (claims did not involve interrelated acts when one alleged that the insureds breached an agreement to relieve the plaintiffs of their obligations as loan guarantors and the other claim did not mention that loan but instead alleged the insureds mismanaged the company in several other respects); *Lehigh Valley Health Network v. Exec. Risk Indem.*, No. 99-5916, 2001 U.S. Dist. LEXIS 73, at *26-28 (E.D. Pa. Jan. 5, 2001) (doctor's claim that insured improperly rescinded his manpower slot and a different doctor's claim that insured conspired with other hospitals to keep him out of the market, abused subpoena process

and denied a fair hearing of his application for the manpower slot were "too attenuated to constitute a single claim").

Other courts, however, look to whether the insured engaged in a pattern of conduct. *Capital Growth Financial LLC v. Quanta Specialty Lines Ins. Co.*, No. 07-80908, 2008 U.S. Dist. LEXIS 65814, at *12-13 (S.D. Fla. July 30, 2008) (although claims involved different investors, additional or different investments and some unique allegations regarding specific misrepresentations, the court concluded they were related because they all alleged that the insureds engaged in a pattern of unsuitable and risky investments); *Continental Cas. Co. v. Orr*, No. 07-292, 2008 U.S. Dist. LEXIS 51205, at *13-14 (D. Neb. July 3, 2008) (although claims involved separate acts of legal malpractice, involving unique damages to different clients, the court concluded they were related because all the allegations involved the law firm's mishandling of the clients' initiation of a coffee shop franchise); *Executive Risk Indem., Inc. v. Integral Equity, L.P.*, No. 03-269, 2004 U.S. Dist. LEXIS 3742, at *32 (N.D. Tex. Mar. 10, 2004) (twelve claims were related because they were based on inducement to invest in funds, the mishandling of those funds, misrepresentations about the performance of the funds and the loss that resulted from the investment).

Here, under either approach, the Trust claim is related to the Emerson claim. If I look solely to the acts involved, both claims included Klutho's decision to shift job costs in early 2003. If I consider a pattern of conduct, both claims involve the directors' decision to expend funds while hiding the company's true financial condition. I therefore conclude that the Emerson claim and the Trust's claim are related.

I note, however, that during oral argument, the Trust argued that because the directors and

officers section and the fiduciary section each separately define wrongful act and interrelated wrongful acts, then a wrongful act under one section is not interrelated with a wrongful act that falls under a different coverage section. That interpretation, however, overlooks other portions of the policy, which refer to claims arising from interrelated wrongful acts that fall under both coverage sections. The common claim endorsement, as noted below, refers to claims arising from interrelated wrongful acts that fall under both coverage sections, as does the provision under the general "limits of liability and retentions" that applies a single retention to a claim arising from interrelated wrongful acts, even if the claim falls under more than one coverage section. I therefore find the Trust's argument unpersuasive.

### C.    Whether the Common Claim Endorsement Applies to the Trust's Claims

The parties dispute whether the wrongful acts must be covered under both the directors and officers and the fiduciary coverage sections to trigger the common claim endorsement. As noted above, the common claim endorsement applies to "any Claim or more than one Claim which arises out of any Interrelated Wrongful Acts, which would, in whole or in part, be covered under the Directors and Officers Coverage Section and the Fiduciary Coverage Section." The directors and officers coverage, however, specifically excludes ERISA claims, while the fiduciary coverage includes ERISA claims.

The Trust contends that the court should construe the common claim endorsement to apply only when the interrelated wrongful acts fall under both the directors and officers coverage and the fiduciary coverage. Specifically, the Trust argues that, assuming that its lawsuit involves interrelated acts, the common claim endorsement does not apply because its ERISA allegations fall solely under the fiduciary coverage section while its derivative causes of action fall under the

OPINION AND ORDER – PAGE 27

directors and officers coverage.  The Trust similarly argues that, assuming that its lawsuit and the

Emerson lawsuit involve interrelated acts, the common claim endorsement does not apply

because the Trust's ERISA allegations fall under fiduciary coverage while the Emerson lawsuit

falls only under the directors and officers coverage.  The Trust further argues that, at the least, the

common claim endorsement is ambiguous regarding whether it is "interrelated wrongful acts" or

"claims" that must fall under both the directors and officers and the fiduciary coverage sections.[3]

     Although the Trust correctly points out that the language "covered under the Directors

and Officers Coverage Section and the Fiduciary Coverage Section" appears to modify

"Interrelated Wrongful Acts," its argument is ultimately unpersuasive.  The common claim

endorsement includes the phrase "in whole or in part."  Thus, even under the Trust's

interpretation, the endorsement applies when the interrelated wrongful acts, at least in part, fall

under both the fiduciary and the directors and officers coverage sections.  Moreover, the policy

language focuses on acts, not the causes of action that flow from those acts.  Here, the

interrelated acts--the directors increased expenditures while hiding the financial condition of the

company and the deceptive financial statement--trigger both coverage sections.  The fact that

those acts gave rise to an ERISA cause of action that falls exclusively under the fiduciary

coverage does not mean the common claim endorsement does not apply.

     In summary, I look beyond the complaints in the underlying actions to determine whether

---

3  The Trust supports its argument that the common claim endorsement does not apply with
evidence that Illinois Union initially indicated that the fiduciary coverage applied to the
Trust's lawsuit.  In Oregon, however, "the duty to indemnify cannot be extended by estoppel.
The scope of an insurer's risk is determined by the terms of the policy, not by the conduct of
the parties subsequent to execution."  *Northwest Pump & Equip. Co. v. Amer. States Ins. Co.*,
144 Or. App. 222, 227, 925 P.2d 1241 (1996); *see also Day-Towne v. Progressive Halcyon
Ins. Co.,* 214 Or. App. 372, 381, 164 P.3d 1205 (2007) (insurer's letter to insured that stated
that that the insurer "accepted coverage" did not change the express terms of the insurance
contract between the parties).

OPINION AND ORDER – PAGE 28

acts are interrelated.  Here, that analysis revealed that the Emerson claim and the Trust's claim involved interrelated wrongful acts.  The common claim endorsement applies because those acts, at least in part, fall under both the fiduciary and the directors and officers coverage sections.  Therefore, I grant defendant's motion for summary judgment on the common claim endorsement.  This ruling does not dispose of this case, but instead clarifies the extent of coverage under the terms of the policy, and thus, in effect, merely limits the Trust's contract damages.

## V.    Breach of Good Faith and Fair Dealing

An insurer has both a contractual duty to defend and employ good faith in that defense as well as a common law duty to exercise due care in conducting the defense of its insured.  The complaint does not state which theory plaintiff seeks to pursue, and the briefing on this issue sometimes conflates the two theories.  In it final brief, however, the Trust indicates that its "bad faith claim is a **negligence** claim for Illinois Union's negligent defense of its insured, including its negligent failure to settle the case and otherwise negligent defense of its insured."  (Pl.'s Sur-Reply Re: Bad Faith, #117, at 2) (emphasis in original).  For purposes of clarity, however, I set forth each duty, and the consequences for breach of the duty, below.

### A.    Insurer's Contractual Duty to Defend

An insurer may be liable for settlement costs if it breaches its contractual duty to defend.  *Northwest Pump & Equip. Co.*, 144 Or. App. at 226.  Breach of the duty to defend, however, "does not itself expand the duty to indemnify beyond the express terms of the policy."  *Id.* at 230.  Thus, an insurer who breaches the duty to defend is only liable for settlement costs to the extent the claims are covered under the policy's indemnity provisions and the costs are reasonable.  *Id.*, *see also Warren v. Farmers Ins. Co.,* 115 Or. App. 319, 326, 838 P.2d 620 (1992) ("If an insurer

does not defend a claim, and thereby breaches its contract with the insured, its liability, if any, is only for breach of contract, not for a tort.").

In addition to the express duty to defend, "there is an obligation of good faith in the performance and enforcement of every contract." *Best v. United States Nat'l Bank*, 303 Or. 557, 561, 739 P.2d 554 (1987).  However, "[t]he implied covenant of good faith does not vary the substantive terms of a contract or require a party to refrain from doing what the contract expressly permits it to do." *Pollock v. D.R. Horton, Inc.*, 190 Or. App. 1, 12, 77 P.3d 1120 (2003).  Rather, good faith requires that each party perform its obligations under the contract, "including exercising any discretion that the contract provides, in a way that will effectuate the objectively reasonable contractual expectations of the parties." *Id.* at 11.

Here, however, the Trust indicates that its bad faith claim is a negligence claim.  Thus, the contractual duty to defend and contractual duty of good faith and fair dealing are not at issue.  I therefore focus on the negligence claim in the section that follows.

### B.    Insurer's Duty to Exercise Due Care

Apart from the duty to defend and the duty of good faith implied in every contract, a liability insurer has an independent duty of care when it undertakes to defend its insured and may be liable to the insured for a judgment in excess of the limits of the liability policy if it fails, negligently or in bad faith, to settle the claim against the insured.  *Georgetown Realty v. Home Ins. Co.*, 313 Or. 97, 110-111, 831 P.2d 7 (1992) (holding that, "when a liability insurer undertakes to defend," it agrees "to stand in the shoes of the party that has been sued" and that "relationship carries with it a standard of care that exists independent of the contract"); *see also* Or. Rev. Stat. § 746.230(f) (requiring that insurers "in good faith . . .  promptly and equitably

settle claims in which liability has become reasonably clear"). The insurer is negligent in failing to settle, "if in choosing not to settle it would be taking . . . a risk that would involve chances of unfavorable results out of reasonable proportion to the chances of favorable results." *Maine Bonding & Cas. Co.*, 298 Or. 514, 518-519, 693 P.2d 1296 (1985). The insurer must approach an opportunity to settle by considering the interests of the insured equally with its own. *Kriz v. Gov't Employees Ins. Co.,* 42 Or. App. 339, 347-348, 600 P.2d 496 (1979). An insurer that, through bad faith or negligence, breaches its duty to the insured, may be liable to the insured for the amount of any excess verdict. *Goddard v. Farmers Ins. Co.*, 173 Or. App. 633, 637, 22 P.3d 1224 (2001).

To prevail in a claim for negligent or bad faith failure to settle within policy limits, an insured must prove: 1) that the insurer breached its duty of care to the insured, 2) causation and 3) damages. *Id.* at 638-639 (reversing trial court's grant of summary judgment to defendant because the facts, viewed in the light most favorable to the plaintiff, established that the injured party would have settled for the applicable policy limit had the insurer offered that limit and explained the basis for its coverage decision); *see also Kriz*, 42 Or. App. at 349 -350 (reversing trial court grant of summary judgment because breach of the duty remained a question a fact where the injured party's offer to settle was equivocal regarding the applicable policy limit). I address each element below.

### 1.    Breach of Duty

The Trust's motion for summary judgment contends that Illinois Union breached its duty of care to the insured to act reasonably in negotiating and settling claims. The Trust argues that Illinois Union breached its duty by placing its own financial interest above the insured's interest

OPINION AND ORDER – PAGE 31

when it allocated the Trust's claim to the directors and officers coverage section only after it had

reduced the coverage available under that section by settling the Emerson claim.  In addition, the

Trust argues that Illinois Union breached its duty by threatening to rescind the contract based on

erroneous information and by misstating the amount of coverage available under the directors

and officers section of the policy.  Illinois Union argues that it did not breach its duty because it

acted within its rights under the policy when it allocated coverage to the directors and officers

portion of the policy.

I find Illinois Union's argument unpersuasive.  Even though Illinois Union was within its

rights when it allocated defense and indemnity of the Trust suit to the directors and officers

coverage section, that does not remedy the fact that it erroneously asserted that it had a basis to

rescind the policy and misstated the amount remaining for settlement.  Illinois Union could have

avoided those errors by reviewing information at its disposal.  *See Radcliffe v. Franklin Nat'l Ins.*

*Co.*, 208 Or. 1, 48, 298 P.2d 1002 (1956) ("Only a decision made by one who exercised due

diligence in apprising himself of the material facts is entitled to respect as made in good faith.")

I therefore find that Illinois Union's erroneous statements concerning rescission and the amount

of coverage available amounted to a breach of its duty of care to the insured.

### 2.    Causation

The insured must prove that its damages were caused by the insurer's breach of its duty.

*Goddard*, 173 Or. App. at 639.  An insured may prove causation through evidence that the

injured party would have accepted a settlement within policy limits had one been offered.  *Id.;*

*Radcliffe*, 208 Or. at 47 (insurer received and declined an offer within policy limits); *Maine*

*Bonding & Cas. Co.*, 298 Or. at 524 (upholding verdict entered against insurer where evidence

OPINION AND ORDER – PAGE 32

showed the injured party would have accepted a lower settlement had the insurer promptly initiated settlement discussions).

Here, both parties fail to establish that the Trust would have accepted an offer within policy limits. Based on my ruling regarding the common claim endorsement, Illinois Union made an offer to settle within the applicable policy limit, the amount remaining under directors and officers coverage. In addition, there is evidence that the Trust would not accept such an offer. Illinois Union, however, misstated the actual amount available for settlement. Thus, Illinois Union has no evidence that the Trust would have denied settlement had Illinois Union properly stated the amount available. The Trust, however, has not averred that it would have accepted Illinois Union's offer had it stated the correct amount.

Alternately, the parties dispute whether Illinois Union's actions prompted the directors to settle for an amount in excess of the coverage limit. The directors point to the provision in the settlement agreement which states that Illinois Union's threat to rescind the policy contributed to their decision to settle. Illinois Union, however, points to evidence that the directors merely wanted out of the litigation, regardless of Illinois Union's coverage position.[4]

I conclude that neither party has met its burden on summary judgment with regard to causation because questions of fact remain regarding that issue. This question of fact is material, however, only if plaintiff can establish the damages element of their bad faith claim. I therefore

---

4  The Trust argues that parol evidence cannot alter the express terms set forth in the settlement agreement. The parol evidence rule prevents parties to an integrated written agreement from contradicting the terms of the agreement in a dispute between the parties over their rights under the agreement. Or. Rev. Stat. § 41.740; *Carolina Cas. Ins. Co. v. Oregon Auto. Ins. Co.*, 242 Or. 407, 413, 408 P.2d 198 (1965). However, "parol evidence can be used to vary or contradict a contract when the litigation is between the party to a contract and a stranger thereto." *Id.* Because Illinois Union is a stranger to the settlement agreement Oregon law does not bar Illinois Union from introducing parol evidence.

turn to that issue.

### 3. Damages

Most cases involving an insurer's breach of the duty to exercise due care when it undertakes to defend its insured concern a situation where "judgment is returned against the insured in excess of the policy limits." *Maine Bonding & Cas. Co.*, 298 Or. at 518. In addition, a settlement, as opposed to a judgment, may lead to damages where, due to the insurer's negligence, the injured party demanded a higher settlement amount. *See id.* at 524-525. In both situations, however, either the insured or an excess liability insurer incurred damages because it was responsible out-of-pocket for the amount in excess of the coverage limit.

In Oregon, "the threat of future harm, by itself, is insufficient as an allegation of damage in the context of a negligence claim." *Lowe v. Philip Morris USA, Inc.*, 344 Or. 403, 410, 142 P.3d 1079 (2008). Here, Illinois Union argues that the directors suffered no damages because no judgment was entered against them, nor could a judgment be entered against them, under the terms of the settlement agreement. Illinois Union is correct that the directors have not suffered damages in the amount of the $1.3 million settlement because the Trust agreed not to file the stipulated judgment and not to proceed against the directors' assets. Although the settlement also provided that the directors would cooperate with and testify in the current lawsuit, nothing suggests that they have failed in that regard and are now liable for the $1.3 million. Thus, although the directors incurred a "loss" under the terms of the policy for purposes of the Trust's breach of contract cause of action, the directors did not suffer $1.3 million in damages for purposes of the negligence claim because they do not have to pay that amount.

The settlement agreement, however, also required that the directors pay $30,000 in their

own funds to settle the Trust's claims, forfeit their accounts in the Alexander Manufacturing

employee stock ownership plan and forgo collection of money due from the plan.  Thus, the

directors have established that they incurred damages.  As noted above, the settlement agreement

indicates that Illinois Union's threat to rescind the policy contributed to the agreement, whereas

Klutho's counsel indicated that the directors were willing to pay the $30,000 regardless of Illinois

Union's position on coverage.  Thus, a material question of fact remains regarding whether

Ilinois Union's erroneous threat to rescind the policy caused the directors' damages.  As a result,

both parties' motions for summary judgment on the bad faith claim are denied.

**CONCLUSION**

Illinois Union's motions for summary judgment on the issue of no loss (#54), settlement

without consent (#57), the fraudulent act exclusion (#51), and bad faith (#48) are denied.  Illinois

Union's motion for summary judgment on the common claim endorsement (#60) is granted.  The

Trust's cross motion for summary judgment on the bad faith claim (#110) is denied.

IT IS SO ORDERED.

Dated this 14th day of October, 2009.


   /s/ Paul Papak          
Honorable Paul Papak
United States Magistrate Judge

OPINION AND ORDER – PAGE 35